[Cite as *W. Environmental Corp. of Ohio v. Hardy Diagnostics*, 2024-Ohio-3051.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

|  |  |  |
|---|---|---|
| WESTERN ENVIRONMENTAL CORPORATION OF OHIO, | : | |
| | : | CASE NO. CA2023-12-109 |
| Appellee and Cross-Appellant, | : | |
| | : | O P I N I O N |
| | | 8/12/2024 |
| - vs - | : | |
| | : | |
| HARDY DIAGNOSTICS, et al., | : | |
| | : | |
| Appellant and Cross-Appellee. | : | |

CIVIL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 21 CV 94033

Millikin & Fitton Law Firm, and Steven A. Tooman Thomas A. Dierling, for appellee and cross-appellant.

Bruns, Connell, Vollmar & Armstrong, LLC, and Thomas B. Bruns and Lucinda C. Shirooni, for appellee and cross-appellant.

The Behal Law Group LLC, and Jack D'Aurora, for appellant and cross-appellee.


**S. POWELL, P.J.**

{¶ 1} Appellant/cross-appellee, Hardy Diagnostics ("Hardy"), appeals the

decision of the Warren County Court of Common Pleas denying it summary judgment for

breach of contract against appellee/cross-appellant, Western Environmental Corporation

of Ohio ("WEC"), opting to instead grant summary judgment to WEC for breach of contract against Hardy. WEC also cross appeals the trial court's decision granting summary judgment to Hardy on its spoliation of evidence claim. For the reasons outlined below, we affirm the trial court's decision granting summary judgment to WEC for breach of contract against Hardy, the denial of summary judgment to Hardy on its breach of contract claim against WEC, and dismiss as moot WEC's cross-appeal from the trial court's decision granting summary judgment on its spoliation of evidence claim to Hardy.

**The Parties**

{¶ 2} Prior to the company being sold in 2022, WEC was a designer and builder of environmental clean areas ("ECA"), or cleanrooms, with its principal place of business located in Franklin, Warren County, Ohio. A cleanroom is a type of controlled environment that requires stringent control of contamination of air, and surfaces, to levels appropriate for accomplishing certain contamination-sensitive activities. Cleanrooms are designed as ISO 1 through 9. The "ISO" abbreviation refers to the International Organization for Standardization 14644-1, a document that sets forth the maximum particulate count for certification of various types of cleanrooms. There is no dispute that ISO standards do not set forth a required minimum number of air changes per hour ("ACH") for cleanrooms that manufacture microbiology products.

{¶ 3} Hardy manufactures various culture media used for microbiological testing in clinical, research, food, and pharmaceutical laboratories. Hardy is incorporated in Wyoming and licensed to do business in Ohio. Prior to WEC and Hardy entering into the contract at issue in this case, Hardy was operating two cleanrooms as part of its business operations: one in Santa Maria, California and the other in Springboro, Warren County, Ohio. There is no dispute that, in 2017, WEC certified the cleanroom that Hardy was

operating in Springboro as meeting the applicable ISO 7 standards.[1]  This cleanroom is known as ECA 1.  There is also no dispute that, in 2019, WEC certified the cleanroom that Hardy was operating in Santa Maria as ISO 7 compliant.  Therefore, given their prior business dealings, it is undisputed that WEC was familiar with Hardy's operating needs, just as Hardy was familiar with WEC's work when certifying ISO 7 compliant cleanrooms, prior to their entering into the contract at issue in this case.

**Facts and Procedural History**

{¶ 4}  The facts in this case are generally not in dispute.  On May 16, 2019, WEC submitted a proposal to Hardy to provide a complete turnkey installation of a new ISO 7 cleanroom within Hardy's manufacturing facility located in Springboro for a total cost of $643,998.00.  This cleanroom was to be known as ECA 2.  Hardy accepted WEC's proposal and thereafter issued a purchase order to WEC on May 22, 2019.  The purchase order that Hardy issued to WEC expressly stated that WEC would "provide all of the design, engineering, project management, equipment, and labor" in the construction of an ISO 7 compliant cleanroom for Hardy at the agreed upon price stated above.  There is no dispute that, when taken together, the above proposal and purchase order constituted a valid and binding contract between WEC and Hardy that obligated WEC to construct an ISO 7 cleanroom for Hardy in accordance with "nationally accepted practices."  There is also no dispute that the contract between WEC and Hardy required the cleanroom that WEC was to build for Hardy be "tested in accordance with accepted industry standards" to ensure that it was ISO 7 compliant.

{¶ 5}  The ISO standards provide that cleanrooms like ECA 2, the cleanroom that

---

1. Pursuant to Table 1 included in the ISO 14644-1 document, a cleanroom certified as meeting ISO 7 standards allow for a maximum concentration limit of 352,000 particles of .5 microns or larger; a maximum concentration limit of 83,200 particles one micron or larger; and a maximum concentration limit of 2,930 particles five microns or larger.

WEC had been contracted to design and build for Hardy in Springboro, may be tested for compliance at various points in their construction and operation. This includes (1) the "as built" stage where construction is complete but with no equipment or personnel present within the room; (2) the "at rest" stage where construction is complete and equipment is installed in the room and ready to operate; or (3) the "in operation" stage where construction is complete and equipment and personnel are present and performing operations in the room. The record indicates that WEC's standard practice was to test the cleanrooms it constructed in the "as built" stage. This was no different for WEC with the construction of ECA 2 for Hardy.

{¶ 6} On March 12, 2020, WEC began its "as built" testing of ECA 2 to ensure it was ISO 7 compliant pursuant to the terms of the contract it had entered into with Hardy. However, as the testing progressed, Bodie Choate, a process engineer employed by Hardy was present for the testing and took his own measurements within ECA 2 that returned low ACH and air pressure readings. Given the low ACH and air pressure readings that he received, Choate questioned whether the "as built" testing of ECA 2 would ultimately pass as ISO 7 compliant, but that ECA 2 would nevertheless fail "later down the road" once Hardy's equipment and personnel were in the room performing operations. Therefore, based upon Choate's measurements, Aaron Buckley, Hardy's director of manufacturing, shut down WEC's testing prior to its completion so that further discussions between Hardy and WEC could take place.

{¶ 7} On March 25, 2020, WEC sent Hardy two "order options" with proposed upgrades to the HVAC system that it had installed for ECA 2. WEC sent this proposal to Hardy in hopes of satisfying its demand requiring ECA 2 to achieve a certain ACH rate at the "in operation" testing stage. WEC did this despite maintaining that the higher ACH rate being demanded by Hardy was not a requirement that ECA 2 needed to achieve

before it could be certified as ISO 7 compliant. Hardy did not accept either of WEC's proposals and thereafter refused to let WEC back onto its property so that it could complete its work on ECA 2 per the terms of their contract. Shortly thereafter, once WEC was removed from the ECA 2 worksite, Hardy contracted with GAME Construction to modify ECA 2 so that it would make the higher ACH rate that it was now demanding ECA 2 to achieve. GAME's modifications to ECA 2 were completed in November of 2020. ECA 2 was subsequently certified as ISO 7 compliant on December 1, 2020.

{¶ 8} On February 22, 2021, WEC filed a complaint against Hardy alleging that it had breached the terms of their contract to the tune of $200,219.34 plus interest and costs. To support this claim, WEC alleged that Hardy had breached their contract when, on March 12, 2020, Hardy "shut down" the project and its construction of ECA 2, excluded it from the worksite where ECA 2 was being constructed, and demanded that it satisfy "certain new conditions" relating to an ACH measurement that were not contained in terms of their original contract and "not required by the ISO 7 industry acknowledged standards…" WEC also requested within its complaint permission to foreclose on the mechanic's lien it had taken out on Hardy's property to recover what it was owed under the contract for the work it had already completed in the development, design, and construction of ECA 2.

{¶ 9} On March 24, 2021, Hardy filed with the trial court a notice that the case had been removed to the United States District Court for the Southern District of Ohio, Western Division, based on diversity jurisdiction. However, on March 8, 2022, the district court granted WEC's motion to have the case remanded back to the trial court. *Western Envtl. Corp. v. Hardy Diagnostics*, 2022 U.S. Dist. LEXIS 40322 (S.D.Ohio Mar. 8, 2022). Upon remand, notice of which the trial court received on March 14, 2022, the trial court held a case management conference and thereafter issued a scheduling order to the

parties on June 8, 2022. This scheduling order required all dispositive motions be filed by the parties with the trial court on or before April 7, 2023. The dispositive motion deadline was thereafter continued by agreement of the parties to September 14, 2023.

{¶ 10} On June 13, 2022, Hardy filed its answer to WEC's complaint. Hardy also filed a counterclaim against WEC alleging that it was WEC, and not Hardy, that breached the terms of their contract. Hardy thereafter filed an amended counterclaim against WEC on June 30, 2022 that included a claim of negligence against WEC. The following month, on July 29, 2022, WEC moved the trial court for leave to file an amended complaint to add a spoliation of evidence claim against Hardy. The trial court granted WEC's motion later that day and, on October 19, 2022, WEC filed an amended complaint that included the spoliation of evidence claim against Hardy set forth above. Following discovery, on September 14, 2023, both WEC and Hardy filed motions for summary judgment on their various causes of action. This included WEC and Hardy each moving for summary judgment on their competing breach of contract claims.

**The Trial Court's Decision**

{¶ 11} On October 20, 2023, the trial court issued a decision granting summary judgment to Hardy on WEC's spoliation of evidence claim and to WEC on Hardy's negligence claim. The trial court's decision also granted summary judgment to WEC on it and Hardy's competing breach of contract claims. This was in addition to the trial court granting summary judgment to WEC on its foreclosure claim. In so doing, the trial court initially stated, in pertinent part, the following:

> [Hardy] argues [WEC] breached the Contract by providing a cleanroom that was not ISO 7 certifiable. [WEC], on the other hand, argues [Hardy] first materially breached the Contract by making it impossible for [it] to certify the ECA 2 cleanroom by completing the ISO 7 standard tests "as built," "at rest," and "in operation."

- 6 -

{¶ 12} Following this initial statement, the trial court noted that the pertinent issues needing to be decided were: (1) "whether [WEC] substantially performed under the Contract;" and (2) "whether [Hardy] breached the Contract and made it impossible for [WEC] to perform." The trial court reached this decision based upon its finding no merit to Hardy's claim that it had terminated the contract simply by excluding WEC from the ECA 2 worksite. The trial court made this determination based on its finding the record devoid of any evidence to indicate Hardy had provided "written notice of such termination, without cause," to WEC as was required by Section 12 of the contract. Specifically, as that section of the contract provided:

> 12. TERMINATION BY THE OWNER WITHOUT CAUSE
>
> - The Contract may be terminated by the Owner without cause.
>
> The Owner shall provide written notice of such termination, without cause, to the Contractor and the Contractor shall
>
> 1. stop all work and related work of the project;
>
> 2. act accordingly as to ensure necessary actions are taken to protect and preserve the work completed; and
>
> 3. terminate all existing purchase agreements and subcontracts and refrain from entering into any additional purchase agreements and subcontracts.
>
> - The Contractor shall be entitled to compensation for all work completed and costs incurred resulting from the termination.

{¶ 13} The trial court thereafter noted its finding that granting summary judgment to WEC for breach of contract against Hardy was proper. The trial court reached this decision based upon the following analysis:

> The Contract provides that [WEC] was to construct ECA 2 to be certified under ISO 7 standards. To that end, the Contract provides that the cleanroom would be "tested in accordance

- 7 -

with industry standards." While testing of ECA 2 began in March 2020 in the "as built" stage, [Hardy] interrupted the testing and never permitted its completion. [Hardy] additionally never permitted testing at any other stage in the process and has now made modifications to ECA 2 which preclude [WEC], [Hardy], and this Court from ever knowing whether ECA 2—as designed and built by [WEC]—would have been certified under ISO 7 standards.

**{¶ 14}** Continuing, the trial court stated:

[Hardy] argues the completion of any testing on ECA 2 was not necessary, as the very preliminary tests showed the ACH rate was well below what is needed to meet ISO 7 standards, especially when the cleanroom would be tested "at rest" and "in operation." Yet, [Hardy] admits that ISO standards—which all agree are the accepted industry standards—do not set forth a minimum ACH rate for cleanrooms. While [Hardy] argues "accepted industry practices" provide guidance for acceptable ACH ranges, the Contract between the parties requires only that the cleanroom test in accordance with "industry standards," not "industry practices." More importantly, it is unclear whether ECA 2 as designed and built by [WEC] would have complied with the Contract by satisfying ISO 7 standards because [Hardy] precluded the completion of *any* testing, whether "as built," "at rest," or "in operation." Had testing concluded and ECA 2 not met ISO 7 standards, the [WEC] would have been in breach of the Contract. But in this case, it is unclear whether ECA 2 would have satisfied ISO 7 standards and been certified at any testing phase because [Hardy] precluded those tests from being completed. In other words, [Hardy] pulled the plug too soon on ECA 2's testing for this Court to find [WEC] breached the Contract, and [Hardy's] early termination of all testing constitutes a material breach.

**{¶ 15}** Concluding, the trial court stated:

Thus, the Court finds [Hardy] materially breached the Contract by precluding [WEC[ from completing testing and certification of ECA 2. [WEC's] ability to certify ECA 2 as ISO 7 compliant was made impossible by [Hardy] stopping testing, not permitting [WEC] to return to the facility, and eventually contracting with another company to modify ECA 2. Accordingly, the Court finds [WEC's] motion for summary judgment well taken and [Hardy's] motion for summary judgment not well taken on the parties' causes of action for breach of contract.

**{¶ 16}** Pursuant to the analysis set forth above, the trial court granted judgment to

WEC on its breach of contract and foreclosure claims. The trial court then awarded WEC damages in the amount of $236,996.02, as well as the authority to foreclose on the mechanic's lien it had taken out on Hardy's property, plus post-judgment interest and costs, for a total of $269,446.12 then due and payable under the contract. One month later, on November 21, 2023, the trial court issued a final judgment entry and decree of foreclosure setting forth its decision granting summary judgment to WEC as set forth above.

**Hardy's Appeal and WEC's Cross-Appeal**

{¶ 17} On December 1, 2023, Hardy filed a notice of appeal from the trial court's decision granting summary judgment to WEC on their competing breach of contract claims.[2] Shortly thereafter, on December 12, 2023, WEC filed a notice of cross-appeal from the trial court's decision granting summary judgment to Hardy on its spoliation of evidence claim. Following briefing, oral argument was held before this court on July 1, 2024. This case now properly before this court for decision, Hardy and WEC have raised a combined three assignments of error for review; Hardy having raised two assignments of error and WEC having raised one cross-assignment of error. For ease of discussion, we will first address Hardy's two assignments of error together, followed by a separate discussion of WEC's single cross-assignment of error.

{¶ 18} Hardy's Assignment of Error No. 1:

{¶ 19} THE TRIAL COURT ERRED BY NOT AWARDING SUMMARY JUDGMENT IN FAVOR OF HARDY ON WEC'S AMENDED COMPLAINT.

{¶ 20} Hardy's Assignment of Error No. 2:

---

2. We note that, on December 4, 2023, Hardy moved the trial court to stay the execution of its judgment pending appeal pursuant to Civ.R. 62(B). The trial court granted Hardy's motion to stay pending appeal on January 1, 2024.

{¶ 21} THE TRIAL COURT ERRED BY NOT AWARDING SUMMARY JUDGMENT IN FAVOR OF HARDY ON ITS AMENDED COUNTERCLAIM.

{¶ 22} In its two assignments of error, Hardy argues the trial court erred by denying its motion for summary judgment and instead granting WEC's motion for summary judgment on their competing breach of contract claims. We disagree.

*Summary Judgment Standard of Review*

{¶ 23} "Summary judgment is a procedural device used to terminate litigation when there are no issues in a case requiring a formal trial." *Franchas Holdings, LLC v. Dameron*, 2016-Ohio-878, ¶ 16 (12th Dist.). "This court reviews a trial court's summary judgment decision under a de novo standard." *Faith Lawley, LLC v. McKay*, 2021-Ohio-2156, ¶ 26 (12th Dist.). De novo means that this court uses the same standard that the trial court should have used. *Brock v. Servpro*, 2022-Ohio-158, ¶ 29 (12th Dist.). Therefore, when conducting a de novo review, this court independently reviews the trial court's decision without giving it any deference. *Baker v. Bunker Hill Haven Home*, 2024-Ohio-875, ¶ 9 (12th Dist.). "When an error is found in a trial court's decision granting a summary judgment motion, the trial court's decision is generally reversed and the matter is remanded to the trial court for further proceedings." *Guzzetta v. Guzzetta*, 2024-Ohio-294, ¶ 17 (12th Dist.), citing *Ginn v. Stonecreek Dental Care*, 2017-Ohio-4370, ¶ 41 (12th Dist.) ("the judgment of the trial court granting summary judgment in favor of [defendant-appellee] is reversed, and the matter is remanded for further proceedings").

*Summary Judgment Pursuant to Civ.R. 56*

{¶ 24} "Civ.R. 56 sets forth the summary judgment standard." *State ex rel. Becker v. Faris*, 2021-Ohio-1127, ¶ 14 (12th Dist.). "Pursuant to that rule, a court may grant summary judgment only when (1) there is no genuine issue of any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) the evidence submitted

can only lead reasonable minds to a conclusion that is adverse to the nonmoving party." *Spitzer v. Frish's Restaurants, Inc.*, 2021-Ohio-1913, ¶ 6 (12th Dist.). "'An issue is genuine only if the evidence is such that a reasonable jury could find for the non-moving party.'" *Bunker Hill* at ¶ 10, quoting *Abbuhl v. Orange Village*, 2003-Ohio-4662, ¶ 14 (8th Dist.). "A material fact is one which would affect the outcome of the suit under the applicable substantive law." *Hillstreet Fund III, L.P. v. Bloom*, 2010-Ohio-2961, ¶ 9 (12th Dist.), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

{¶ 25} "The moving party bears the initial burden of informing the court of the basis for the motion and demonstrating the absence of a genuine issue of material fact." *Berkheimer v. REKM*, LLC, 2023-Ohio-116, ¶ 18 (12th Dist.), citing *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). "Once this burden is met, the nonmoving party has a reciprocal burden to set forth specific facts showing there is some genuine issue of material fact yet remaining for the trier of fact to resolve." *Sullivan v. Mercy Health*, 2022-Ohio-4445, ¶ 21 (12th Dist.). To do this, the nonmoving party may not simply rest upon "the mere allegations or denials in its pleadings." *Deutsche Bank Natl. Trust Co. v. Sexton*, 2010-Ohio-4802, ¶ 7 (12th Dist.). The nonmoving party must instead "supply evidentiary materials setting forth specific facts showing there is a genuine issue of material fact for trial." *Anderson v. Jancoa*, 2019-Ohio-3617, ¶ 23 (12th Dist.). "Summary judgment is proper if the nonmoving party fails to set forth such facts." *Taylor v. Atrium*, 2019-Ohio-447, ¶ 10 (12th Dist.).

*Elements of a Breach of Contract Claim*

{¶ 26} "To establish a claim for breach of contract, a plaintiff must prove (1) the existence of a contract, (2) plaintiff fulfilled his or her contractual obligations, (3) defendant failed to fulfill his or her contractual obligations, and (4) due to this failure plaintiff incurred damages." *Capital Real Estate Partners, LLC v. Nelson*, 2019-Ohio-2381, ¶ 13 (12th

- 11 -

Dist.). That is to say, "[t]o establish a cause of action for breach of contract, a plaintiff must prove: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages or loss resulting from the breach." *JDS So Cal, Ltd. V. Dept. of Natural Resources*, 2018-Ohio-1159, ¶ 37 (10th Dist.). "A defendant breaches a contract when he fails, without legal excuse, to perform a promise that forms the whole or part of the contract." *Swift Transp. Co. v. Williams*, 2018-Ohio-718, ¶ 12 (10th Dist.), citing *Natl. City Bank v. Erskine & Sons, Inc.*, 158 Ohio St. 450 (1953), paragraph one of the syllabus. In other words, "[a] breach of contract occurs when a defendant does not perform one or more of the terms of the contract." *Innovative Architectural Planners, Inc. v. Ohio Dept. of Adm. Servs.*, 2024-Ohio-824, 46 (10th Dist.). However, "[a] breach of a portion of a contract does not discharge the obligations of the parties to the contract unless the breach is material." *Lamar Advantage GP Co., LLC v. Patel*, 2012-Ohio-3319, ¶ 26 (12th Dist.).

{¶ 27} "A 'material breach of contract' is a failure to do something that is so fundamental to a contract that the failure to perform defeats the essential purpose of the contract or makes it impossible for the other party to perform." *Marion Family YMCA v. Hensel*, 2008-Ohio-4413, ¶ 7 (3rd Dist.). To determine whether a breach of a contract is material, a court is to consider the following five factors:

> the extent to which the injured party will be deprived of the expected benefit, the extent to which the injured party can be adequately compensated for the lost benefit, the extent to which the breaching party will suffer a forfeiture, the likelihood that the breaching party will cure its breach under the circumstances, and the extent to which the breaching party has acted with good faith and dealt fairly with the injured party.

*Bd. of Commrs. of Clermont Cty., Ohio v. Batavia*, 2001 Ohio App. LEXIS 712, *7-*8, 2001-Ohio-4210 (12th Dist. Feb. 26, 2001), citing *Software Clearing House v. Intrak, Inc.*, 66 Ohio App.3d 163, 170 (1st Dist.1990). "Where the facts are undisputed and the only

question to be resolved is whether a breach of contract occurred," such as the case here, "a question of law exists for the court to decide*." Stephan Business Ents., Inc. v. Lamar Outdoor Advertising Co.*, 2008-Ohio-954, ¶ 16 (1st Dist.).

*Hardy's Arguments and Analysis*

{¶ 28} To support its two assignments of error, Hardy raises several arguments as to why it believes the trial court erred by granting summary judgment to WEC on their competing breach of contract claims. This includes Hardy arguing the trial court "overlooked" the portion of the contract that required WEC to design and construct ECA 2 in accordance with "nationally accepted practices." This also includes Hardy arguing the trial court "failed to acknowledge" that their contract required WEC to build ECA 2 to "meet the ISO 7 standard when operating." This is in addition to Hardy arguing the trial court "failed to acknowledge" the "implicit agreement" that it had made with WEC requiring it to have completed the construction of ECA 2 by a certain "implicitly agreed" upon completion date. However, upon fully considering each of Hardy's arguments, including those not expressly stated above, we find no error in the trial court's decision to grant summary judgment to WEC on the parties' competing breach of contract claims.

{¶ 29} Rather, after a thorough review of the record, we agree with the trial court's decision finding Hardy breached the contract by precluding WEC from completing *any* testing of ECA 2, whether that be "as built," "at rest," or "in operation," before shutting down the project and removing WEC from the ECA 2 worksite. This is because, by denying WEC the ability to complete its testing, Hardy prevented a determination from ever being made as to whether WEC's design and construction of ECA 2 satisfied the terms of their contract. That is to say, and just as the trial court before us found, Hardy "pulled the plug too soon on ECA 2's testing" for this court, or any other court, to determine whether WEC breached their contract by designing and constructing a cleanroom for

Hardy that did not satisfy ISO 7 standards. To the extent Hardy argues otherwise, such argument lacks merit.

{¶ 30} Rather than WEC, it was instead Hardy that breached its contract by making it impossible for WEC to complete the construction and testing necessary to determine whether ECA 2 was ISO 7 compliant. This constitutes a material breach of contract. This is because, as noted above, "[a] 'material breach of contract' is a failure to do something that is so fundamental to a contract that the failure to perform defeats the essential purpose of the contract *or makes it impossible for the other party to perform*." (Emphasis added.) *Marion Family YMCA*, 2008-Ohio-4413 at ¶ 7. "A 'material' breach entitles a party to stop performing, which, in essence, terminates the contract." *Mid. Am. Constr., LLC v. Univ. of Akron*, 2019-Ohio-3863, ¶ 56 (10th Dist.). Therefore, finding the trial court did not err by granting summary judgment to WEC on its breach of contract claim against Hardy, nor did the trial court err by denying summary judgment to Hardy on its competing breach of contract claim against WEC, Hardy's first and second assignments of error lack merit and are overruled.

{¶ 31} WEC's Cross-Assignment of Error No. 1:

{¶ 32} THE TRIAL COURT ERRED WHEN IT FOUND THAT WEC COULD NOT PROVE THE THIRD, FOURTH, AND FIFTH ELEMENTS OF ITS CLAIM FOR SPOLIATION OF EVIDENCE.

{¶ 33} In its single cross-assignment of error, WEC argues the trial court erred by granting Hardy's motion for summary judgment on its spoliation of evidence claim. However, given our resolution of Hardy's two assignments of error set forth above, thereby affirming the trial court's decision to award WEC with damages in an amount equal to that which WEC was entitled under its contract with Hardy, we find this issue has now been rendered moot.

**{¶ 34}** Pursuant to App.R. 12(A)(1)(c), "[u]nless an assignment of error is made moot by a ruling on another assignment of error," this court shall "decide each assignment of error and give reasons in writing for its decision." "An assignment of error is moot when an appellant presents issues that are no longer live as a result of some other decision rendered by the appellate court." *Sweitzer v. 56 Auto Sales*, 2023-Ohio-2997, ¶ 9 (12th Dist.). That is to say, an issue becomes moot when it presents only a hypothetical or academic question, and a judicial resolution of the issue would have no practical significance. *State ex rel. Ford v. Ruehlman*, 2016-Ohio-3529, ¶ 55. Such is the case here with regard to the trial court's decision granting summary judgment to Hardy on WEC's spoliation of evidence claim. Therefore, in accordance with App.R. 12(A)(1)(c), WEC's cross-assignment is moot and need not be addressed by this court. Accordingly, WEC's single cross-assignment of error is dismissed as moot.

**Conclusion**

**{¶ 35}** For the reasons outlined above, we affirm the trial court's decision granting summary judgment to WEC on its breach of contract claim against Hardy, as well as the trial court's decision denying Hardy's breach of contract claim against WEC, and dismiss as moot WEC's cross-appeal from the trial court's decision granting Hardy's motion for summary judgment on its spoliation of evidence claim.

**{¶ 36}** Judgment affirmed.

PIPER and M. POWELL, JJ., concur.